UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-21244-CIV-GOODMAN

[CONSENT CASE]

JASZMANN ESPINOZA, et al.,

    Plaintiffs,

v.

GALARDI SOUTH
ENTERPRISES, INC., et al.,

    Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND FOR OTHER RELIEF

This Cause is before the Court on Plaintiffs' motion for a preliminary injunction and for other relief. [ECF No. 13]. Defendants oppose the motion. [ECF No. 30]. The Court held an evidentiary hearing on the motion. [ECF No. 78]. For the reasons outlined below, the Court **grants in part and denies in part** Plaintiffs' motion. In particular, the Court grants Plaintiffs' requests that Defendants reinstate Seleta Stanton ("Stanton") and Tiffany Thompson ("Thompson") and that Defendants be prohibited from retaliating against dancers who join this action. The Court, however, denies Plaintiffs' remaining requests.

## I.  BACKGROUND

### A. General Factual Background

Plaintiffs are dancers who are suing Defendants for, among other things, minimum wage and overtime violations arising from their work[1] at Defendant Fly Low, Inc. d/b/a King of Diamonds ("KOD"), a strip club. [ECF No. 14]. Plaintiffs allege claims under the Fair Labor Standards Act ("FLSA") and Florida law. [*Id.* at pp. 19-24].

### B. The Instant Motion

According to Plaintiffs, around the time this action was filed (April 8, 2014), Defendants began requiring all dancers to sign arbitration agreements. [ECF No. 13, pp. 4-5]. In theory, these arbitration agreements would prevent dancers from opting into this lawsuit, or any other similar lawsuit. If a dancer refused to sign the arbitration agreement, then she was not allowed to perform at KOD. Plaintiffs contend that this is what happened to Plaintiffs Stanton, Shanice Bain ("Bain"), and Thompson, all of whom were asked to sign an arbitration agreement. [ECF No. 13, pp. 4-7]. As such, Plaintiffs contend that Defendants unlawfully retaliated against Stanton, Bain, and Thompson. In addition, Plaintiffs argue that Defendants' dissemination of these post-lawsuit

---

[1]  The Court understands why Plaintiffs contend that they "worked" at KOD, while Defendants contend that Plaintiffs "performed" at KOD. For purposes of this Order, the Court uses those words interchangeably. Put another way, by using the word "perform" or "work" the Court is not implying either way whether Plaintiffs were employees or independent contractors.

agreements is an impermissible attempt to interfere with the proposed class. As a result, Plaintiffs request the following relief from the Court:

1. Requiring Defendants to reinstate all KOD entertainers who have been terminated from employment since the filing of this action (April 8, 2014) for participating in or supporting this action and/or refusing to agree to arbitrate legal claims encompassed by this action which arose prior to April 8, 2014;

2. Prohibiting Defendants from retaliating or discriminating in any way against Plaintiffs and all persons similarly situated based on involvement in, participation in, or eligibility to participate in this action or any other pursuit of claims under the FLSA and/or the Florida Minimum Wage Law, Fl. Stat. § 448.110;

3. Requiring Defendants to transmit to Plaintiffs and all persons similarly situated a written disclaimer to the effect that no individual employee is required to dismiss or otherwise withdraw from this action, or to agree to arbitrate legal claims that arose prior to April 8, 2014, in order to continue employment with Defendants;

4. Requiring Defendants to post a written notice, in a conspicuous location at KOD, to the effect that no individual employee who was employed at KOD as of April 8, 2014, is required to dismiss or otherwise withdraw from this action, nor agree to arbitrate any legal claims which arose prior to April 8, 2014, in order to continue employment with the Defendants;

5. Tolling the statute of limitations for "Opt-in" Plaintiffs to join this action until the Court rules on Plaintiffs' upcoming Motion For Conditional Certification;

6. A declaration that any claimed "arbitration agreements" entered into between KOD and entertainers since the filing of this action are unenforceable;

7. Prohibiting Defendants from attempting to interfere with or prevent similarly situated persons from "opting-in" to this action by way of requiring them, on pain of termination of employment, to agree to retroactive, compulsory arbitration of their FLSA and/or Florida state law claims, which accrued prior to April 8, 2014;

8. Prohibiting Defendants from communicating to Plaintiffs and all persons similarly situated that they will or may be terminated from employment if they do not agree to arbitrate the pre-existing legal claims encompassed by this action;

9. Requiring Defendants to provide to the Court and Plaintiffs' counsel, in advance, any and all contracts, agreements, policies, rules, or regulations which they intend to impose on, or enter into with entertainers, which contracts, agreements, policies, rules, or regulations would or might affect the legal claims pressed in this case in any material respect;

10. Requiring defendants to include in any future written communications to Plaintiffs (and persons similarly situated) the following disclaimer:

> This communication represents the opinion of King of Diamonds Management. It is unlawful for King of Diamonds, its management, or any other Defendant to retaliate against employees who choose to participate in this case or assist Plaintiffs' counsel in this case.

[ECF No. 13, pp. 1-3].

Defendants oppose the motion. {ECF No. 30]. First, they contend that Bain and Thompson cannot show that they suffered an adverse employment action. [*Id.* at pp. 4-7]. Second, they contend Plaintiffs are not entitled to injunctive relief for their retaliation

4

claims because they cannot show that they are "employees" under the FLSA. [*Id.* at pp. 4-5]. Finally, Defendants contend that the arbitration agreements at issue are lawful and did not impermissibly interfere with the class.

### C. The Evidentiary Hearing

On June 12, 2014, the Court held a lengthy evidentiary hearing on Plaintiffs' motion. [ECF No. 78]. Following this hearing, the Court makes the following findings of fact:

1. <u>KOD's Arbitration Agreement Policy and Its Implementation</u>

In late March or early April of 2014, Defendants adopted a policy requiring all individuals working at KOD, not just dancers, to sign arbitration agreements that included a class waiver provision. [*Id.* at p. 11]. But KOD began disseminating the arbitration agreements only after this action was filed on April 8, 2014. [*Id.* at pp. 23-24]. At this time, it is not clear what the impetus behind this new policy was or when it was created. [*Id.* at pp. 36, 115].

To implement this policy, Tangelia Scott ("Scott"), who worked KOD's front door, was tasked with the job of making sure every dancer signed an arbitration agreement. [ECF No. 78, p. 33]. Scott was instructed that if a dancer refused to sign, then she could not perform, unless she was involved in this lawsuit. [*Id.* at pp. 17, 27, 33]. But Scott was not given a list of the dancers who were named Plaintiffs. Rather, Scott was instructed that if a dancer refused to sign **and affirmatively** notified Scott that she was

involved in the lawsuit, then the dancer could perform without signing. [*Id.* at pp. 27, 34-35, 47].

### 2. Implementation of KOD's Arbitration Policy as to Thompson

Thompson began working at KOD in 2010. [ECF No. 78, p. 88]. Around April 19, 2014, when Thompson went to KOD to perform, Scott presented her with the arbitration agreement. [*Id.* at p. 89]. At this time, Thompson was a named Plaintiff in this lawsuit. Thompson was given an opportunity to read the agreement. After reading it, Thompson informed Scott that she needed to take it home to have an attorney look at it before she could sign. [*Id.*]. Scott then told her that she could not work unless she signed the agreement. [*Id.* at pp. 89-91]. Thompson was sent home that night. While Scott did not allow Thompson to take the agreement with her, she did allow Thompson to take pictures of it. [*Id.* at p. 89].

A few days later, Plaintiffs' counsel let Thompson know that she could return to work at KOD. [*Id.* at p. 91]. It appears that after being contacted about this issue by Plaintiffs' counsel, Defendants' counsel instructed their clients to allow Thompson to return. When Thompson returned a week or so after the first incident, there did not appear to be any problems. But later that night, Thompson was called to the front by Scott and was again informed that she had to sign the arbitration agreement. [*Id.* at pp. 91-93]. When Thompson refused to do so, she was told she had to stop working and was escorted out of KOD. [*Id.* at pp. 92-94, 102-04].

6

### 3. Implementation of KOD's Arbitration Policy as to Stanton

Stanton started working at KOD in 2009. [ECF No. 78, p. 47]. When Stanton came in to work on April 18 or 19, 2014, Scott presented her with the arbitration agreement to sign. [*Id.* at p. 50]. At this point, Stanton, like Thompson, was a named Plaintiff. Stanton was allowed to take the agreement into the dressing room area so that she could privately review it. [*Id.* at p. 61]. By Stanton's own account, neither Scott nor anyone else associated with KOD monitored her or hovered around her while she read the agreement. [*Id.* at pp. 61-62].

After reading the arbitration agreement and speaking with her attorney (i.e., Plaintiffs' counsel), Stanton came back out to the front and told Scott that she could not sign the agreement. [*Id.* at pp. 50-51]. Scott then informed her that if she did not sign the agreement, then she could not work. [*Id.*]. It was around this time that Ricky Taylor ("Taylor"), a KOD manager, came over and asked Stanton if she was suing KOD. [*Id* at pp. 51-52]. Stanton told Taylor that she did not want to talk about it. [*Id.* at p. 51]. By her non-answer, Taylor figured out that Stanton had, in fact, sued KOD and told her that she needed "to get [her] things and go" and that she was no longer allowed to work at KOD. [*Id.* at pp. 51, 65].

### 4. Implementation of KOD's Arbitration Policy as to Bain

Like Stanton, Bain started working at KOD in 2009. [ECF No. 78, p. 69]. On April 20, 2014, Bain was working on KOD's stage area. [*Id.* at p. 70]. As she was leaving the

7

stage, she was called up to the front by Scott. [*Id*.]. Scott then gave Bain the papers and told her to sign them. [*Id.* at p. 71]. Much like Stanton, Bain was provided the opportunity to read the agreement without Scott or any other KOD employee monitoring or hovering around her. [*Id.* at pp. 76-77]. It is important to note that unlike Stanton and Thompson, Bain was *not* then a named Plaintiff in this action. Bain joined this action 3 days later, on April 23, 2014. [ECF No. 8].

After reviewing the agreement, Bain told Scott that she could not sign it. [ECF No. 78, p. 71]. As Bain explained at the hearing, the reason she did not sign the arbitration agreement had nothing to do with whether she could join **this lawsuit**. [*Id.* at pp. 71-72, 81]. Rather, Bain was apparently uncomfortable with the idea of giving up her right to go to court should any issues arise with KOD. [*Id.* at pp. 71-73, 77-78]. While Bain was talking to Scott, one of KOD's managers, Akinyele Adams ("Adams"), interjected himself into the conversation and told Bain that if she did not sign the agreement, then she had to leave and could no longer perform at KOD. [*Id.* at pp. 73-74]. When Bain again refused, Adams had security escort her out. [*Id.*].

### D. Post-Hearing Developments

On August 6, 2014, various media outlets reported that KOD (i.e., both the real estate and the ongoing business) had been sold to a third-party. The Court held a telephonic hearing on August 12, 2014 to discuss the impact of this sale on the case. [ECF No. 93]. At the hearing, counsel confirmed that KOD had been sold, but did not

know much else. Accordingly, the Court entered an Order requiring Defendants to produce certain sale-related information. [ECF No. 97]. The information Defendants submitted confirms that KOD was indeed sold to a third-party. [ECF Nos. 102; 103 (sealed)].

## II. DISCUSSION

In evaluating Plaintiffs' myriad requests for relief, the Court has divided Plaintiffs' requested relief into two broad categories: the retaliation-related requests and the class certification-related requests. Plaintiffs' requests 1 through 4, including their request for the reinstatement of Bain, Thompson, and Stanton, fall into what the Court has categorized as the retaliation-related requests. Plaintiffs' requests 5 through 10 fall into what the Court has categorized as the class certification-related requests. The Court will examine each category of requested relief below and then discuss the impact of KOD's sale on this Order.

### A. The Retaliation-Related Requests

#### 1. *Applicable Legal Standard*

Under the FLSA's anti-retaliation provision, it is unlawful for employers "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). If a putative

employer violates this provision, then an employee may obtain injunctive relief by demonstrating the following:

> (1) a substantial likelihood of success on the merits of the underlying case,
> (2) the movant will suffer irreparable harm in the absence of an injunction,
> (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest.

*Clincy v. Galardi S. Enters., Inc.*, No. CIVA 109CV-2082-RWS, 2009 WL 2913208, at *1 (N.D. Ga. Sept. 2, 2009) (internal citation omitted).

Contrary to Defendants' arguments [ECF No. 30, p. 4], the substantial likelihood of success on the merits prong refers to the FLSA retaliation claim, not the underlying FLSA claim. *Clincy*, 2009 WL 2913208, at *2-3 (ordering reinstatement in similar circumstances and noting that while dancers may prevail on underlying FLSA wage claim, they had demonstrated substantial likelihood of success on FLSA retaliation claim); *see also Bailey v. Gulf Coast Transp., Inc.*, 280 F.3d 1333, 1337 (11th Cir. 2002) (rejecting defendants' argument that a final adjudication finding that they were the plaintiffs' employers was necessary for reinstatement under FLSA anti-retaliation provision).

In turn, to establish a "prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf*

*v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (internal citations and quotations omitted).

    2. *Analysis*

        i. <u>Request for Relief Number 1</u>

At the evidentiary hearing, Defendants rightfully **conceded** that Stanton and Thompson should be allowed to return to KOD. [ECF No. 78, pp. 126-27]. Accordingly, the Court grants Stanton and Thompson's request for reinstatement and directs KOD to reinstate them (if they still want to be reinstated).[2] To the extent that there are other similarly situated KOD dancers, then KOD is ordered to reinstate them (if the dancers still want to be reinstated). *See Clincy*, 2009 WL 2913208, at *2-3 (ordering reinstatement of dancers in similar circumstances).

As to Bain, at the close of the evidentiary hearing, Plaintiffs' counsel stated that she is not seeking reinstatement. [ECF No. 78, p. 109]. The Court therefore denies her requested relief.

        ii. <u>Request for Relief Number 2</u>

Based on Defendants' commendable concession at the hearing regarding Stanton and Thompson, the Court grants this request.

---

[2]     Plaintiffs have not updated the Court on the recent activities of theses specific dancers, and it is entirely possible that they have moved, have found other employment which they prefer, or simply do not want to return to KOD.

11

### iii. Request for Relief Numbers 3 and 4

The Court denies these requests as unnecessary and moot in light of the Court's orders granting Plaintiffs' motion for conditional certification of their FLSA claims and their proposed notice. [ECF Nos. 116; 119]. In particular, in the notice, to be sent to other KOD dancers, the Court approved the following language:

> You have [sic] right to participate in this lawsuit free from any fear that Defendants will retaliate against you. . . . Defendants will not discharge you or retaliate against you in any manner because you choose to participate in this action.

[ECF No. 119, p. 1]. The Court finds this sufficient to let dancers know that they may not be dismissed for joining this action.[3] *See also, Clincy v. Galardi S. Enters., Inc.*, No. 1:09-CV-2082-RWS, 2010 WL 966639, at *4 (N.D. Ga. Mar. 12, 2010) (denying dancers' request for similar corrective letter to be sent by the strip club defendants).

### B. The Class Certification-Related Requests

As noted, Plaintiffs' requests 5-10 are for the most part related to their then-forthcoming class certification motions. Those motions were later filed [ECF Nos. 33; 35]. The Court has granted one of these motions -- i.e., Plaintiffs' motion for conditional FLSA class certification. [ECF No. 116]. As a preliminary matter, the Court denies as moot request number 5. In granting Plaintiffs' motion for conditional certification of their FLSA claims and approving the proposed notice, the Court tolled the statute of

---

[3] If the Court grants Plaintiffs' Rule 23 class certification motion [ECF No. 33], then the Court will also include similar language in that notice.

limitations for potential "opt-in" Plaintiffs to the date of the Court's Order. [ECF Nos. 116; 119]. If the Court grants Plaintiffs' Rule 23 class certification motion [ECF No. 33], then the Court will order the same.

As to Plaintiffs' remaining requests, they hinge on whether the Court finds that Defendants impermissibly interfered with the potential class by presenting the arbitration agreements. If so, then Plaintiffs' request that the Court declare all such arbitration agreements *per se* invalid and not enforce them (request 6) and enter other curative relief (requests 7-10) to remedy Defendants' misconduct.

1. *Applicable Legal Standard*

The first question confronting the Court is to determine the appropriate legal standard for analyzing Plaintiffs' requests.

i. What is The Applicable Legal Standard?

In the context of a collective action, there are two general, and different, ways in which a court may declare invalid, or not enforce, arbitration agreements entered into by plaintiffs (and potential class members) after the action was initiated. First, a court may find the arbitration agreements unconscionable, procedurally or substantively. *Abdul-Rasheed v. KableLink Commc'ns, LLC*, No. 8:13-CV-879-T-24 MAP, 2013 WL 6182321, at *3 (M.D. Fla. Nov. 25, 2013) (denying FLSA defendants' motion to compel arbitration because court found arbitration agreements procedurally and substantively unconscionable). Second, a court may exercise its collective action managerial

responsibilities by refusing to enforce the arbitration agreements as a way to correct defendants' pre-certification misconduct. *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919, 922-24 (11th Cir. 2014) (affirming district court's decision to not enforce arbitration agreements on the ground that it was a proper exercise of district court's responsibility to manage collective actions).

Here, Plaintiffs have not argued that KOD's arbitration agreements are procedurally or substantively unconscionable. Rather, they have argued that the Court should exercise its discretion to manage this collective action and declare invalid and not enforce KOD's arbitration agreements. Accordingly, the Court is focusing solely on that issue and makes clear that nothing in this Order relates to any finding that the arbitration agreements at issue are, or are not, unconscionable.

> ii. <u>Legal Standard: The Court's FLSA [4] Collective Action Managerial Responsibility</u>

The FLSA permits a plaintiff to bring a collective action on behalf of himself and other similarly situated employees. *See* 29 U.S.C. § 216(b). The purposes of § 216(b) collective actions are "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from

---

[4] The Court is examining its managerial responsibility to manage FLSA collective actions because the Court has conditionally certified Plaintiffs' FLSA claims. [ECF No. 116]. But the Court has not ruled on Plaintiffs' Rule 23 class certification motion [ECF No. 33]. As a result, if the Court denies Plaintiffs' Rule 23 motion, then there would be no need to examine this issue. On the other hand, if the Court grants that motion, then much of the same analysis here is applicable. *See Billingsley*, 560 F. App'x at 922 n. 11.

the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264–65 (11th Cir. 2008) (citing *HoffmanLa Rouche, Inc. v. Sperling*, 492 U.S. 165, 170 (1989)).

An FLSA class action, unlike a Federal Rule of Procedure 23 class action, includes only those plaintiffs who affirmatively opt into the action by filing their consent in writing to the court in which the action is brought. *See* 29 U.S.C. § 216(b). Consequently, the benefits of a collective action "depend on employees receiving accurate and timely notice . . . so that they can make informed decisions about whether to participate." *Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 673 (S.D. Fla. 2013) (citing *Hoffman-La Rouche*, 493 U.S. at 170).

As the Eleventh Circuit recently explained, "[b]ecause formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district court, pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety." *Billingsley*, 560 F. App'x at 921. As such, trial courts have considerable discretion to "facilitat[e] notice to potential plaintiffs" and "broad authority" to exercise control over the collective action and to govern the conduct of counsel and parties in the collective action, so as to avoid any "such prejudice and impropriety and to ensure the potential plaintiffs have a fair opportunity to opt-in to a FLSA collective action." *Billingsley*, 560 F. App'x at 921 (citing *Gulf Oil Co. v. Bernard*,

452 U.S. 89, 100 (1981); *Hoffmann–La Roche,* 493 U.S. at 169–71; *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1200 (11th Cir. 1985)).

Using that broad and considerable discretion, other courts have refused to enforce arbitration agreements foisted on potential FLSA plaintiffs where the agreements were confusing, misleading, coercive, and clearly designed and implemented to unfairly thwart potential FLSA plaintiffs' ability to opt-in. *Billingsley*, 560 F. App'x at 919, 922-24 (affirming district court's decision to not enforce arbitration agreements on the ground that it was a proper exercise of district court's responsibility to manage collective actions); *Carter v. Doll House II, Inc.,* No. 14-CV-1097-MHS, ECF No. 15, (N.D. Ga. July 9, 2014) (exercising discretion and refusing to enforce strip club's arbitration agreements to prevent unfairness and confusion);[5] *see also Williams v. Securitas Sec. Servs. USA, Inc.*, No. CIV.A. 10-7181, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011); *but see Stevenson v. Great Am. Dream, Inc.*, No. 1:12-CV-3359-TWT, 2014 WL 3519184, at *2 (N.D. Ga. July 15, 2014) (granting strip club's motion to compel arbitration against dancer in FLSA collective action and declining to exercise discretion to not enforce arbitration agreement).

---

[5] The district court's decision in *Carter*, a similar case to the one here, is currently pending on appeal before the Eleventh Circuit and appellants, the strip club operators have filed their reply brief. *See* Reply Brief, No. 14-13132-AA, 2014 WL 5090104 (Oct. 6, 2014).

2. *Analysis*

Having reviewed the record and the applicable law, the Court declines to find, at this time, that all of KOD's arbitration agreements are *per se* unenforceable. The Court, however, is also not finding these arbitration agreements are *per se* enforceable. Instead of making a blanket determination, the Court will examine the enforceability of the arbitration agreement on an individualized basis when, and if, defendants move to compel arbitration against an opt-in dancer who has signed such an agreement. Several reasons support the Court's decision to deny Plaintiffs' requests 6-10.

First, the Court does not find the arbitration agreements misleading or confusing. Courts have found arbitration agreements misleading or confusing, and refused their enforcement, where the agreements "did not require an employee to sign the document before [becoming] effective," and "[were] written in single-spaced, small type and crafted so as not to be easily understood by lay persons." *Williams*, 2011 WL 2713741, at *2-3 (refusing to enforce arbitration agreement). There are no such circumstances here. KOD's arbitration agreements are not in condensed type space. They are easily understood, as evidenced by Bain's understanding of the agreement after reading it. And they require any dancer to sign the agreement before becoming effective. *Stevenson*, 2014 WL 3519184, at *2-3 (distinguishing *Williams* on same basis).

Second, based on Stanton, Bain, and Thompson's testimony, the Court cannot say, at this time, that KOD has implemented the arbitration agreements in an

"interrogation-like" manner, like in *Billingsley.* There, the FLSA defendant implemented its arbitration policy solely against putative class members by having them led into a back room with only a human resources representative and a witness. *Billingsley*, 560 F. App'x at 918-19. Here, it appears that dancers were given an opportunity to read the agreement without being led into back rooms or with KOD managers or employees hovering over them. Indeed, Stanton was able to take the agreement to the dressing room, and she read it in privacy. Thompson was permitted to take pictures of the agreement so that she could send it to an attorney.

Third, the Court is unable to conclusively determine when and why KOD rolled out its arbitration policy when it did. Even a cursory review of the case law shows that these are important, if not dispositive, factors. For instance, in *Billingsley*, after a two-day evidentiary hearing, the trial court found that the FLSA defendant implemented its arbitration policy only after the court had instructed plaintiffs to file their collective class certification motion and with the intent of reducing the class. *Id.* at 918-19; *see also Carter*, No. 14-CV-1097-MHS, ECF No. 15, pp. 13-15 (noting that arbitration policy was only rolled out three-weeks after lawsuit was filed).

Here, there is little evidence as to exactly when this policy was put into place. It appears the policy was put into place in late March or early April 2014 and implemented in mid-April [ECF No. 78, p. 11]. This lawsuit, however, was filed in early April (April 8, 2014). As such, it is not clear if this policy was put into place before or

18

after Defendants had knowledge of this lawsuit. Similarly, other than the temporal connection, there is no evidence as to why KOD implemented this policy when it did. While Plaintiffs would like the Court to use this temporal connection to reach the conclusion that the arbitration agreements were implemented in response to this lawsuit, the Court declines to do so. The temporal connection, without more, is simply too slim a read to reach this conclusion.[6]

Finally, the Court does not have before it an opt-in plaintiff who has signed the arbitration agreement and who Defendants have moved to compel arbitration against. To the contrary, it appears that, to date, all the Plaintiffs in this action did not sign the arbitration agreement. Moreover, Defendants may very well make the strategic choice to not move to compel arbitration against any opt-in Plaintiff who signed the arbitration agreement.[7] Consequently, the Court does not find that the issue is ripe.

As a result of the foregoing, the Court allowed Plaintiffs' FLSA class notice to include language allowing potential opt-ins to join this action, even if they had signed the arbitration agreement at issue. [ECF No. 119]. If such an opt-in plaintiff joins this

---

[6] During discovery, Plaintiffs will likely be able to obtain more evidence on this issue.

[7] The Court can think of several strategic and financial reasons why Defendants may not move to compel arbitration. For instance, it may make more monetary sense to globally settle all of Plaintiffs' claims rather than litigate or arbitrate them on an individualized, piecemeal basis.

action and Defendants move to compel arbitration as to that opt-in plaintiff, then the Court will examine whether arbitration should be compelled as to that opt-in plaintiff.

### C. The Effect of KOD's Change of Ownership

As noted above, while this motion was pending, KOD was sold to a third-party, who is not a party to this action. On several occasions, the Court noted to the parties its concern about how that sale affects the Court's decision on this motion -- and, in particular, how it affects the Court's decision, based on Defendants' concession, that KOD reinstate Stanton and Thompson. Accordingly, within 7 days of this Order, the parties shall file a succinct joint notice advising whether KOD has complied with this Order (assuming that plaintiffs still want reinstatement, another issue which should be explained in the notice).

### III. CONCLUSION

Plaintiffs' motion for preliminary injunction and other relief is **granted in part and denied in part**.

**DONE and ORDERED**, in Chambers, in Miami, Florida, November 18, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record