UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-21244-CIV-GOODMAN

[CONSENT CASE]

JASZMANN ESPINOZA, et al.,

    Plaintiffs,

v.

GALARDI SOUTH
ENTERPRISES, INC., et al.,

    Defendants.
_____/

## ORDER DENYING DEFENDANT'S MOTIONS TO COMPEL ARBITRATION

Defendant Fly Low, Inc. moves to compel arbitration against opt-in claimants[1] Shavone Moore, Jordan Hargraves, Krystall Wright and Ashley Delgado pursuant to the requirements of an arbitration policy that each claimant signed. [ECF Nos. 166; 168].[2] Plaintiffs do not dispute that each of these opt-in claimants signed the arbitration

---

[1]     Each of the claimants has opted into [ECF Nos. 137-3; 137-11; 137-12; 142-1] the Fair Labor Standards Act collective action that the Court previously certified [ECF No. 116].

[2]     Defendant initially filed a motion to compel concerning only claimants Moore, Hargraves and Wright [ECF No. 166]; however, one week later, Defendant filed a supplemental motion to compel claimant Delgado to arbitration and adopting the reasoning set forth in the original motion. Plaintiff responded to both motions in a single document [ECF No. 172] and Defendant filed a single reply memorandum [ECF

agreements at issue, which Defendant attached [ECF Nos. 166-1; 166-2; 166-3; 168-1] to the motions to compel. However, Plaintiffs argue that the Court should not enforce the agreements in accordance with its responsibility to police collective actions. The Undersigned agrees. Accordingly, for the reasons outlined below, the Undersigned **DENIES** Defendant's motions to compel arbitration.

I.  BACKGROUND

  A.  General Factual Background

Plaintiffs are dancers who are suing Defendants for, among other things, minimum wage and overtime violations arising from their work[3] at Defendant Fly Low, Inc. d/b/a King of Diamonds ("Defendant" or "KOD"), a strip club. [ECF No. 14]. Plaintiffs allege claims under the Fair Labor Standards Act ("FLSA") and Florida law. [*Id.*, at pp. 19-24]. The Court previously granted conditional certification of an FLSA collective action against Defendants. [ECF No. 116]. More than 20 claimants have opted into this collective action. [ECF Nos. 123; 126; 128; 129; 137; 142; 149; 151].

---

No. 177] in support of both motions. The Undersigned is accordingly issuing a single ruling on both motions.

[3]   The Court understands why Plaintiffs contend that they "worked" at KOD, while Defendants contend that Plaintiffs "performed" at KOD. For purposes of this Order, the Court uses those words interchangeably. Put another way, by using the word "perform" or "work," the Court is not implying either way whether Plaintiffs were employees or independent contractors.

## B. The Instant Motion

After this action was filed (April 8, 2014), Defendants began requiring all dancers to sign arbitration agreements. [ECF Nos. 78, pp. 23-24; 89-1, pp. 4-5]. In theory, these arbitration agreements would prevent dancers from opting into this lawsuit, or any other similar lawsuit. If a dancer refused to sign the arbitration agreement, then she was not allowed to perform at KOD. [ECF Nos. 78, pp. 23-24; 89-1, pp. 5-6].[4] Opt-in claimants Moore, Hargraves, Wright and Delgado all signed these identical agreements in either late April 2014 or May 2014, after this action was filed. [ECF Nos. 166-1; 166-2; 166-3; 168-1].

In the ruling on Plaintiffs' motion for temporary restraining order and preliminary injunction, the Undersigned "decline[d] to find, at th[e] time, that all of KOD's arbitration agreements are per se unenforceable." *Espinoza v. Galardi S. Enter., Inc.*, No. 14-21244, 2014 WL 6473236, *8 (S.D. Fla. Nov. 18, 2014). Instead of making a

---

[4] Defendant presents a more-nuanced position in its response to Plaintiffs' request for admissions, denying that "it advised each and every entertainer to whom it presented an arbitration agreement that she could not continue to work at KOD unless she signed an arbitration agreement." [ECF No. 89-1, p. 6]. However, Defendant states in the very next sentence that if "the entertainer asked KOD whether signing the arbitration agreement was a condition of their continuing to perform at KOD, or if she declined to sign the agreement, then KOD admits she was likely informed that signing the agreement was a condition of continuing to perform at KOD." [*Id.*].

At the evidentiary hearing the Court held concerning Plaintiffs' motion for a temporary restraining order and preliminary injunction, Defendant's general manager, who directly implemented the arbitration policy, answered unequivocally in the affirmative when asked on the record "if they didn't sign it, they were fired." [ECF No. 78, p. 23-24].

3

blanket determination, the Undersigned opted instead to "examine the enforceability of the arbitration agreement on an individualized basis when, and if, defendants move to compel arbitration against an opt-in dancer who has signed such an agreement." *Id.* Defendant now moves to compel arbitration against four opt-in claimants who signed the agreement. [ECF Nos. 166; 168]

Plaintiffs oppose the motion. [ECF No. 172]. Plaintiffs contend that Defendants' dissemination of these post-lawsuit agreements (and the subsequent attempt to enforce the agreements against these four opt-in claimants) is an impermissible attempt to interfere with the proposed class.

## II.  DISCUSSION

### A.  Applicable Legal Standard

Section 3 of the Federal Arbitration Act ("FAA"), requires that a court, upon motion by a party to an action in federal court, stay the action if it involves an "issue referable to arbitration under an agreement in writing." 9 U.S.C. § 3. The FAA mandates that a contract clause requiring the parties to "submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable and enforceable[.]" 9 U.S.C. § 2. "A prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results.'" *Preston v. Ferrer*, 552 U.S. 346, 357-58 (2008) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 633 (1985).

Congress enacted the FAA to "declare 'a national policy favoring arbitration of claims that parties contract to settle in that manner.'" *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009) (quoting *Preston v. Ferrer*, 552 U.S. 346, 353 (2008)). The Supreme Court has interpreted this to mean that courts must "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985).

In the context of a collective action, there are two general, and different, ways in which a court may declare invalid, or not enforce, arbitration agreements entered into by plaintiffs (and potential class members) after the action was initiated. First, a court may find the arbitration agreements unconscionable, procedurally or substantively. *Abdul-Rasheed v. KableLink Commc'ns, LLC*, No. 8:13-CV-879-T-24 MAP, 2013 WL 6182321, at *3 (M.D. Fla. Nov. 25, 2013) (denying FLSA defendants' motion to compel arbitration because, in part, the court found the arbitration agreements procedurally and substantively unconscionable). Second, a court may exercise its collective action managerial responsibilities by refusing to enforce the arbitration agreements as a way to correct defendants' pre-certification misconduct. *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919, 922-24 (11th Cir. 2014) (affirming district court's decision to not enforce arbitration agreements on the ground that it was a proper exercise of district court's responsibility to manage collective actions).

Here, Plaintiffs have not argued that KOD's arbitration agreements are procedurally or substantively unconscionable. Rather, they have argued that the Court

5

should exercise its discretion to manage this collective action and declare invalid and not enforce KOD's arbitration agreements. Accordingly, the Court is focusing solely on that issue and makes clear that nothing in this Order relates to any finding that the arbitration agreements at issue are, or are not, unconscionable.

The FLSA permits a plaintiff to bring a collective action on behalf of himself and other similarly-situated employees. *See* 29 U.S.C. § 216(b). The purposes of § 216(b) collective actions are "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264–65 (11th Cir. 2008) (citing *Hoffman La Rouche, Inc. v. Sperling,* 492 U.S. 165, 170 (1989)).

An FLSA class action, unlike a Federal Rule of Procedure 23 class action, includes only those plaintiffs who affirmatively opt into the action by filing their consent in writing with the court in which the action is brought. *See* 29 U.S.C. § 216(b). Consequently, the benefits of a collective action "depend on employees receiving accurate and timely notice . . . so that they can make informed decisions about whether to participate." *Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 673 (S.D. Fla. 2013) (citing *Hoffman-La Rouche,* 493 U.S. at 170).

As the Eleventh Circuit explained, "[b]ecause formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district court, pre-certification, *ex parte* communication with putative FLSA collective

6

members about the case has an inherent risk of prejudice and opportunities for impropriety." *Billingsley*, 560 F. App'x at 921. As such, trial courts have considerable discretion to "facilitat[e] notice to potential plaintiffs" and "broad authority" to exercise control over the collective action and to govern the conduct of counsel and parties in the collective action, so as to avoid any "such prejudice and impropriety and to ensure the potential plaintiffs have a fair opportunity to opt-in to a FLSA collective action." *Id.* (citing *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981); *Hoffmann–La Roche,* 493 U.S. at 169–71; *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1200 (11th Cir. 1985)).

Using that broad and considerable discretion, other courts have refused to enforce arbitration agreements foisted on potential FLSA plaintiffs where the agreements were confusing, misleading, coercive, and clearly designed and implemented to unfairly thwart potential FLSA plaintiffs' ability to opt-in. *Billingsley*, 560 F. App'x at 919, 922-24 (affirming district court's decision to not enforce arbitration agreements on the ground that it was a proper exercise of district court's responsibility to manage collective actions); *Carter v. Doll House II, Inc.*, 69 F. Supp. 3d 1351 (N.D. Ga. 2014) (exercising discretion and refusing to enforce strip club's arbitration agreements to prevent unfairness and confusion);[5] *see also Williams v. Securitas Sec. Servs. USA, Inc.*,

---

[5]   The district court's decision in *Carter*, a similar case to the one here, was vacated in part by the Eleventh Circuit because the district court "made factfindings based on inferences from dates rather than live testimony." *Carter v. Doll House II, Inc.*, 608 F. App'x 903, 904 (11th Cir. 2015). The district court's *legal* findings, particularly concerning its managerial powers in a collective action, were not challenged however.

7

No. CIV.A. 10-7181, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011); *but see Stevenson v. Great Am. Dream, Inc.*, No. 1:12-CV-3359-TWT, 2014 WL 186101, at *2 (N.D. Ga. Jan. 16, 2014) (granting strip club's motion to compel arbitration against dancer in FLSA collective action and declining to exercise discretion to not enforce arbitration agreement).

**B. Analysis**

Plaintiffs do not contend that the arbitration agreements at issue here are unconscionable (and, in fact, go out of their way to emphasize this by including a section headlined "Unconscionability Analysis Not Implicated"). [ECF No. 172, pp. 5-6]. Instead, Plaintiffs exclusively invoke the Court's authority to police collective actions by "prevent[ing] confusion and unfairness" and "ensur[ing] that the potential plaintiffs have a fair opportunity to opt-in to [this] FLSA collective action." *Billingsley*, 560 F. App'x at 921.

While collective actions "serve an important function in our system of civil justice," they simultaneously present "opportunities for abuse as well as problems for courts and counsel in the management of cases." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-100 (1981) (discussing Federal Rule of Civil Procedure 23 class actions); *see Hoffmann-La Roche*, 493 U.S. at 171 (1989) (extending *Gulf Oil* to collective actions). Specifically, FLSA collection actions "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed

8

decisions about whether to participate." *Id.* at 170. "Because formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district court, pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety." *Billingsley*, 560 F. App'x at 921 (emphasis added). *Cf. Kleiner*, 751 F.2d at 1203 (In a Rule 23 class action, the Eleventh Circuit found that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. . . . Concomitantly, a solicitations scheme relegates the essential supervision of the court to the status of an afterthought.")

"To avoid such prejudice and impropriety and to ensure the potential plaintiffs have a fair opportunity to opt-in to a FLSA collective action, the district court has the discretion to facilitat[e] notice to potential plaintiffs and broad authority to exercise control over the collective action and to govern the conduct of counsel and parties in the collective action." *Billingsley*, 560 F. App'x at 921 (citing *Gulf Oil*, 452 U.S. at 100 (class actions); *Hoffmann-La Roche*, 493 U.S. at 169-71 (affirming the power of district courts to exercise control over collective actions)) (internal quotations omitted). "A district court's authority to control counsels' conduct in a § 216(b) collective action includes the authority to prevent confusion and unfairness concerning an FLSA collective action." *Id.* (citing *Hoffmann-La Roche*, 493 U.S. at 169–71).

9

In *Billingsley*, the defendant implemented a retroactive arbitration policy after an FLSA lawsuit was filed (and contemporaneous to the court's scheduling of the collective action certification process), which targeted potential members of the collective action. 560 F. App'x at 917-19. In particular, the defendant held two-on-one private, backroom meetings with putative collective action claimants, where the potential claimants were presented with an arbitration agreement to sign that was a condition of their continued employment. *Id.* at 918-19. The district court found the meetings to be "highly coercive" and interrogation-like." *Id.* at 919. Furthermore, the district court concluded that the defendant's roll-out of the arbitration policy "was a hurried reaction specifically targeted at curtailing [the] litigation." *Id.* Accordingly, the district court invoked its broad authority to manage parties and counsel in an FLSA collective action, determining that the defendant's conduct undermined the court's authority to manage the collective action and correcting the effect of the defendant's improper conduct by refusing to enforce the arbitration agreements. *Id.* at 922.

The *Billingsley* court deemed the defendant's efforts to impose arbitration agreements "confusing, misleading, coercive, and clearly designed to thwart unfairly the right of [potential claimants] to make an informed choice as to whether to participate in [the] FLSA collective action." *Id.* Not every one of those elements is present here.

First, as the Undersigned previously concluded in the Order on Plaintiffs' motion for temporary restraining order and preliminary injunction, "the Court does not find the arbitration agreements misleading or confusing. . . . KOD's arbitration agreements are not in condensed type space. They are easily understood, as evidenced by [now-terminated Plaintiff Shanice Bain's] understanding of the agreement after reading it. And they require any dancer to sign the agreement before becoming effective." 2014 WL 6473236, at *8.

Second, "based on . . . [the] testimony [of three Plaintiffs at the evidentiary hearing], the Court cannot say . . . that KOD has implemented the arbitration agreements in an 'interrogation-like' manner, like in *Billingsley*." *Id.* As described above, in *Billingsley*, the defendant rolled out the arbitration policy with intimidating backroom meetings targeted only at potential class members. 560 F. App'x at 918-19. "Here, it appears that dancers were given an opportunity to read the agreement without being led into back rooms or with KOD managers or employees hovering over them. Indeed, [Plaintiff Seleta] Stanton was able to take the agreement to the dressing room, and she read it in privacy. [Plaintiff Tiffany] Thompson was permitted to take pictures of the agreement so that she could send it to an attorney." *Espinoza*, 2014 WL 6473236, at *8.

Despite the absence of an interrogative, intimidating atmosphere and any confusion inherent in the agreement, Defendants' arbitration policy was clearly coercive and admittedly designed to undermine this litigation. While Defendants decry the

11

absence of affidavits or other evidence of an *intimidating* process of arbitration implementation,[6] the evidence of an abusive, manipulative arbitration rollout for the purpose of undermining this litigation is undisputed.

First, like in *Billingsley* and *Abdul-Rasheed*,[7] Defendants, after an FLSA collective lawsuit was underway, presented an arbitration agreement to potential opt-in claimants that waived their right to join an FLSA collective action and was a condition of continued employment. *See* 560 F. App'x at 919 (the defendants "informed the [potential claimants] that the arbitration agreement was a condition of continued employment"); 2013 WL 6182321, at *2 ("if the [potential claimants] did not sign the [arbitration agreement] within 30 days, Defendants told [claimants] that Defendants would no longer give them any work."). The evidence on the record is clear that if employees did not sign the arbitration agreement, then they would no longer be able to perform at KOD. [ECF Nos. 78, pp. 23-24; 89-1, pp. 5-6].

---

[6]     As the Undersigned previously found, there is clearly no intimidation and no "interrogation-like" meetings in this action, nor do Plaintiffs even allege that in their response to the motion to compel arbitration.

[7]     In *Abdul-Rasheed*, as the Undersigned noted above, the district court refused to enforce arbitration agreements in an FLSA collective action because of a finding that the agreements were themselves unconscionable under Florida law, and separately, "that the arbitration provision and collective action waiver . . . [were] abusive in that it threatens the proper functioning of the litigation." 2013 WL 6182321, at *3.

As the Undersigned noted above, Defendants' General Manager affirmed at the evidentiary hearing that this was the policy. [ECF No. 78, p. 24].[8] While KOD states this policy in a more-nuanced manner in its response to requests for admission [ECF No. 89-1, pp. 5-6],[9] the Undersigned finds, based on the testimony of the witnesses at the evidentiary hearing (including the confirmation from named Plaintiffs who refused to sign the agreement that they were, in fact, no longer provided the opportunity to work [*See e.g.* ECF No. 78, p. 65]),[10] in combination with Defendants' own admission, that Defendants did in fact make the signing of the subject arbitration agreement a condition of continuing employment. The Undersigned finds the implementation of this policy to be, like in *Billingsley* and *Abdul-Rasheed*, "coercive" and "abusive."

---

[8]   Q.   Okay. And you understood that it was a condition of employment or to continually perform as a dancer that they sign this arbitration agreement. In other words, if they didn't, they were out the door; is that right?
A.   Yes.

[ECF No. 78, p. 24].

[9]   "If, however, the entertainer asked KOD whether signing the arbitration agreement was a condition of their continuing to perform at KOD, or if she declined to sign the agreement, then KOD admits she was likely informed that signing the agreement was a condition of continuing to perform at KOD." [ECF No. 89-1, p. 6].

[10]   Q.   Were you ever specifically told that you were fired by anybody?
A.   Yes.

[ECF No. 78, p. 65 (testimony of Plaintiff Stanton)].

While the Court previously abstained from ruling on the *per se* unenforceability of the arbitration agreements partially because of a lack of pinpoint specificity on the timing of Defendants' arbitration policy formulation and rollout, which clouded the issue of Defendants' intent, the record is now clear on Defendants' **purpose**. In response to Plaintiffs' requests for admissions, Defendants unequivocally admit that (1) "[s]ubsequent to April 8, 2014, KOD presented entertainers with an agreement to arbitrate disputes arising between entertainers and KOD[;]"(2) "KOD's post-April 8, presentation of agreements to arbitrate disputes between KOD and its entertainers was **motivated, at least in part, by the filing of this civil action**[;]" and (3) "KOD's post-April 8, 2014 presentation to its entertainers of agreements to arbitrate disputes between KOD and its entertainers was intended, at least in part, **to dissuade entertainers from participating in this civil action**." [ECF No. 89-1, p. 5] (emphasis added). Thus, like in *Billingsley* and *Abdul-Rasheed*, Defendants clearly intended to undermine the proper functioning of this litigation.

The district court in *Carter* inferred the defendants' intent (i.e. interfering with the ongoing collective action) by chronology alone. 69 F. Supp. 3d at 1358 ("Given the timing of the Agreement (post-filing, pre-certification), its immediate implementation (the Agreement applies if a dancer continues to work at Stilettos), and its repressive terms (retroactive application, waiver of claims not brought to arbitration, and a prohibition of collective action), the Court finds that it has been designed to unfairly

14

thwart Carter's and potential opt-in plaintiffs' rights."). The Eleventh Circuit vacated the district court's ruling solely on the basis of that court's inferences made from an insufficient factual record. 608 F. App'x at 904. Unlike the trial court in *Carter*, the Undersigned did not need to make inferences concerning Defendants' intent; Defendants clearly **admitted** their purpose of undermining this litigation.

Defendants point to *Geter v. Galardi S. Enter., Inc.*[11] and *Stevenson* to support their motion, but both of those cases are inapposite. *Geter* features the very same arbitration agreements and policy implementation by the same Defendants that are present here. 2015 WL 1268276. While the district court in *Geter* granted Defendants' motion to compel arbitration against two opt-in plaintiffs, that court rejected the plaintiffs' objections on different grounds than are present here. In fact, the *Geter* court did not substantively address the propriety of Defendants' arbitration policy with regard to its potential for undermining the collective action litigation per *Billingsley*. The *Geter* court found the arbitration agreements enforceable because the plaintiffs' argument to the contrary was enjoined by judicial estoppel; the court was precluded from making factual findings as to Defendants' means of arbitration implementation (i.e. whether it was coercive, manipulative, interrogation-like, etc.) because the plaintiffs' denied that the two opt-in claimants even signed the agreements in the first place. 2015 WL

---

[11] No. 14-21896-CIV, 2015 WL 1268276 (S.D. Fla. Mar. 19, 2015) (FLSA collective action case filed by a second group of dancers against the same Defendants filed in this District in close proximity to the current action, which features many overlapping issues).

1268276, at *3. Plaintiffs here do not contest that the four opt-in claimants at issue here actually signed the agreement, and so the *Geter* ruling is inapplicable.

Likewise, in *Stevenson*, where a district court in the Northern District of Georgia enforced arbitration agreements signed by dancers after an FLSA collective action was underway, the court addressed a separate issue than the one at issue here. 2014 WL 186101.

As noted above, there are two ways in which a court may declare invalid, or not enforce, arbitration agreements entered into by potential class members after the action was initiated. In the first approach (the one that Plaintiffs explicitly declined to invoke [ECF No. 172, pp. 5-6]), a court may find the arbitration agreements unconscionable, procedurally or substantively. *Abdul-Rasheed*, 2013 WL 6182321, at *3. In *Stevenson*, the district court addressed *only* this first test, the unconscionability argument, concluding that, under Georgia law, the arbitration agreements in question were not unconscionable. 2014 WL 186101, at *2-3. Unconscionability is not at issue here.[12]

---

[12] Defendant further invokes unconscionability through references to *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005), in which the Eleventh Circuit found that having a worker sign an arbitration agreement as a condition of continued employment lawful. However, *Caley* is not applicable for two reasons. First, the Eleventh Circuit's ruling concerned the *conscionability* of having an employee sign such an agreement generally. *Id.* at 1377. And second, the arbitration policy in *Caley* was implemented more than a year *before* the plaintiffs filed their lawsuits. *Id.* at 1364-66 (Complaints filed on November 17, 2003 and arbitration policy mailed to employees on July 15, 2002).

Accordingly, to "prevent confusion and unfairness" and "ensure that the potential plaintiffs have a fair opportunity to opt-in to [this] FLSA collective action," the Court will exercise its managerial powers. *Billingsley*, 560 F. App'x at 921 (citations omitted). Thus, the Court refuses to enforce the arbitration agreements [ECF Nos. 166-1; 166-2; 166-3; 168-1] against opt-in claimants Moore, Hargraves, Wright and Delgado.

### III. CONCLUSION

The Undersigned hereby **DENIES** Defendant's motions to compel arbitration.

**DONE and ORDERED**, in Chambers, in Miami, Florida, December 31, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record